## McClurg's Appeal.

1. A husband's wilful absence from his wife, being in legal acceptation malicious, is sufficient to support a decree for divorce *a mensa et thoro* and alimony.

2. It is a question for the court below whether offers of a husband to renew cohabitation are made in sincerity and with an intention bonâ fide to perform his marital duty.

3. A formal offer cannot always be accepted as a genuine act.

4. One-third of a husband's annual profits or income is the *maximum* of alimony.

5. Where a portion of the rents of a husband's land were appropriated to pay debts with which it was encumbered, the alimony allowed was one-third of what remained beyond the appropriation.

6. The order of alimony is part of the final decree, and when brought up by appeal is, with all the evidence the subject of the jurisdiction of the Supreme Court.

7. Brenig *v.* Brenig, 2 Casey 161, distinguished.

November 2d and 3d 1870. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Appeal from the decree of the Court of Common Pleas of *Allegheny county:* No. 64, to October and November Term 1869.

On the 1st of April 1867, Margaret McClurg presented a libel for divorce against Alexander McClurg. The libel set out the marriage of the parties on the 1st of July 1845, their cohabitation as man and wife until July 1st 1864, the desertion of the respondent from that time, and that before that date he had offered such indignities to the person of the libellant as to render her condition intolerable and her life burdensome.

The prayer was for a divorce from bed and board and alimony.

The respondent by his answer denied the desertion, but averred desertion by the libellant, that she had not demeaned herself as a dutiful wife, &c., but that he had conducted himself as a faithful husband; denied offering indignities as alleged in the libel, or having given her cause to absent herself from his home; averred that her absence was without just cause, and he offered, as he had theretofore offered since her absence, to receive her and cohabit with her and treat her as he had always done as a good husband should do.

A very large amount of testimony was taken by the examiner appointed by the court.

Amongst other evidence were the following letters:—

"Pittsburg, January 30th 1865.

"Mr. McClurg:

"The house in which I live has been sold; and as you are the person who should provide me with a home, I wish you to let me know what you intend to do in the matter. Please write to me, as I do not wish to have a personal interview, for it would be painful to me.　　　　　　　　　　　　　　　　M. McClurg."

"Pittsburg, January 30th 1865.

"Madam: I must express much surprise at receiving a note from you of this date stating, 'the house you live in was sold, and you wished to know what I intended to do in the matter.' I can only reply, I have not now, nor have I ever had any intentions in the matter, you took the house without consulting me, and I would think it proper for you to ask further advice, from those you preferred to consult at that time. I went to it at that time, it is true, at your request, and remained in it much longer than I was welcome, and indeed, I now confess, I am really surprised at my forbearance, and blame myself for not leaving long before I did, the only excuse I can offer, is the abhorrence I always have had to a public rupture, and the stigma that might attach to the members of my innocent family, if your scandalous stories would be believed. I remained even after you called me 'a poor, dirty, mean, lowlifed wretch, more than once,' and ordered me out of your house repeatedly, and if I did not leave you would have me put out by force, &c. This, I believe, you thought you could do, and consulted at least one or more than one attorney on the subject, the above and many more reasons for my course I have already given in writing to your sister Mrs. Claise, now in your house, and I presume you have seen them, as I intended you should, and left her at liberty to show them to any one interested, and invited investigation as to the truth of all I said. Since I wrote that paper, I am informed you told one or more persons, you wished me to go back, and they might tell me so, and on the

second instant, colored Adam, the waiter here, was at your house, you questioned him a great deal about me, told him it looked very bad to see me living at a hotel, and you keeping house, that you wished me to go back, and that you spoke very feelingly, and actually with tears in your eyes, &c., &c.   I replied, I did not believe it, that your remarks were only feigned, and that the tears of some women were easily brought forth, &c.   However, to prove the falsity of his expressions, I went down the same evening, and the moment I went into the parlor you got up and left it.   I sat down by Mrs. Claise for a few minutes and promised to bring or send her a paper I had drawn up with my reasons for leaving the house, &c.   Some days after I took the paper down, rang the bell and inquired of the girl who came to the door for Mrs. Claise, then for you, she replied to each inquiry, no, no, nor would you or Mrs. Claise be in until dinner time, one o'clock, it was then eleven, A. M.   I felt satisfied this was not true, said I could not come down again, and I wanted a book, passed the girl and went up stairs, and in a few minutes came down again and found you. in the hall.   You denied having told the girl to say you were not in, but told her to say, if I called, you did not want to see me, *you know all this*, and I only repeat it to show the deception you practised on poor Adam and the others.   I repeated the facts to him, his remark was, 'is it possible any women could be so deceitful?'   This he did with uplifted hands, and added, 'I thought from what she told me, she wished you to go back, and wanted me to tell you so.'   If Mrs. Claise has not shown you that paper, I now request her to do so.   I remain, with all due respect, if any,                              ALEXANDER McCLURG."

"Pittsburg, March 8th 1865.

"Madam : On the 30th of January last, I answered your note received that day, subsequently it has occurred to me to inform you that I intend residing at the cottage this summer as usual, and expect to go there about the 1st of April, and notwithstanding you took the house you now live in by advice of others, without consulting me or asking my consent, a house in which I never felt at home in, and where you took much pains to make me feel myself a stranger and most uncomfortably situated, and finally calling me by opprobrious names, and ordering me out of your house, and if I did not go you would force me to do so, &c.   Yet as you now say, 'I am the person who should provide you with a home,' I think it proper to tell you where and when I am going, and cordially invite you to accompany me.   In case you conclude to do so, I shall immediately write to my daughter Mary to come and live with me (if you have no objection); the only condition I make, and that I will insist on, is that Lizzie Guthrie is not to be an inmate in the family.   It is necessary for me to know your

decision soon as possible, as some arrangements will have to be made.            Yours, as before,

                                    "ALEXANDER McCLURG."

This letter is the one referred to in the next following.

"It is now about eighteen or twenty months since I had the, to me, extremely unpleasant duty to perform, of answering your note sent me through Dennis Breen, to which I have never received any reply.   However, as I had the opportunity this week of hearing the marriage ceremony repeated, I asked myself, have I done all my duty?   And if my wife, who came under the same solemn obligations and vows to live together until death, has not performed hers, is there sufficient excuse for me?   The result has been, if it is an error, to err on the safe side, and make another effort of conciliation, and lay all feeling aside; however aggravated. My son Trevor was married on Wednesday, 26th inst., and would be pleased if I would take up house again, and he and his wife live with me.   They have gone on a visit to St. Paul, Minn., to see his sister Caroline, and will return in about two weeks, as it is their intention to stop in Chicago a few days with Alexander.   In the meantime, I would endeavor to get a house, in case you see proper to embrace the opportunity of the invitation to come to live with us, as from all accounts that come to my knowledge, you are now, or soon will be tired of keeping a boarding-house merely for the support of, and having your niece Lizzie G. living with you.   I shall expect an answer to this as soon as possible.

        "Yours, &c.,            ALEXANDER McCLURG."

The facts of the case are found in the condensed statement of testimony in the opinion of Mr. Justice Agnew.

The Court of Common Pleas decreed as follows :—

"And now, March 3d, A. D. 1869, the court having heard this cause on libel, answer and testimony, and having fully considered and proceeded to determine the same, as to law and justice appertain, do grant unto the said Margaret McClurg, the libellant, a divorce from the bed and board of the said Alexander McClurg, the respondent ; and having fully considered the circumstances of the said Alexander McClurg, the court allows to the said Margaret McClurg, the annual sum of twelve hundred dollars ; her alimony to be paid by the said Alexander McClurg, in monthly payments of one hundred dollars on the 1st day of each month, and that the said Alexander McClurg give security, to be approved by this court, for the payment of said allowance.

"And it is further ordered that the said Alexander McClurg pay the costs of this proceeding."

The respondent appealed to the Supreme Court and assigned for error :—

16 P. F. SMITH—24

1. Decreeing to the libellant a divorce from the bed and board of the respondent.

2. Allowing to the said Margaret McClurg the annual sum of $1200 for her alimony.

*R. B. Roberts* and *B. F. Lucas* (with whom was *A. G. Lucas*), for appellant.—Desertion is actual abandonment of matrimonial cohabitation with intent to desert: Ingersoll *v.* Ingersoll, 13 Wright 249. The husband has the right to designate the residence of himself and wife: Bishop on Marr. & Div. 788. Separation by consent is not desertion: 2 Id. 671. The wife's refusal of the husband's offer to renew cohabitation was desertion by her: 1 Id. 787. He had a right to prohibit the visits of the wife's friends: 1 Id. 758. To constitute cruelty there must be actual violence or a reasonable apprehension of it: 1 Id. 717; Lockwood *v.* Lockwood, 2 Curtis 281; Tomkins *v.* Tomkins, 1 Swab. & T. 168; Richards *v.* Richards, 1 Grant 389; s. c. 1 Wright 225.

*S. Schoyer* and *T. M. Marshall*, for appellee.

The opinion of the court was delivered, January 3d 1871, by

AGNEW, J.—In the year 1845, Alexander McClurg, an old man, a widower, and the father of a large grown-up family, married Margaret Caskey, a maid not young, yet of only half his years. The fruits of this ill-assorted match soon ripened, like Dead Sea apples, into ashes. Losses from unfortunate business connections, and crushing embarrassments, soured his temper and made him close and penurious. The means of display withheld, and disappointed hopes, augmented by disagreements with his family, made her unhappy and discontented. Disputes and bitterness ensued, followed by harshness, unkindness, and want of sympathy on his part, and all that unholy train of evils which mark an unequal marriage. As time sped on matters grew worse, and finally in June 1864, Alexander McClurg separated from his wife, and has since continued apart from her. On the 9th of February 1867, Mrs. McClurg filed her libel for a divorce from bed and board, and for alimony, on the grounds of a wilful and malicious desertion, without reasonable cause; and of such indignities offered to her person as rendered her condition intolerable and her life burdensome. After a full hearing, the court below granted the divorce, and decreed alimony to Mrs. McClurg in the sum of $1200. From this decree Alexander McClurg has appealed. The testimony is very voluminous; yet after a careful study of it, we cannot say that the court below committed any plain error. The desertion and its continuance are clearly proved, and so far as we can discover was without sufficient legal reasonable cause for it; while on the contrary he appears to have been

[McClurg's Appeal.]

actuated by perverse feelings, leaving the conclusion that his absence was wilful, and, in legal acceptation, malicious. This single ground is sufficient to support the decree, and it is therefore unnecessary to determine how far the conduct and course of treatment pursued by him toward her are sufficient to establish the second ground of the libel, that he had offered such indignities to her person as to render her condition intolerable, and her life burdensome.

But it will be necessary to refer to the evidence on this point, in order to determine what weight should be given to his offers to receive and provide a home for her, one of which was made before the proceeding for a divorce was begun, and the other during its proceeding. The evidence shows, that before her marriage Mrs. McClurg was a lively, pleasant, amiable and happy lady. She did not continue so many months after her union with Mr. McClurg. Her married life soon became full of trouble and discontent, her temper disturbed, and she was often found in tears. Taking the evidence as a whole, it would seem that he was unkind, spoke harshly at times, and uttered language to her in the presence of strangers, and even at the public table, calculate to wound and degrade a shrinking, sensitive mind, or to rouse one of a different temper to angry passion. A chief source of trouble between them was money. He accused her of extravagance, and she considered him penurious and stingy. He had been wealthy, but doubtless his circumstances for years demanded economy. But unless we conclude that she was base and dishonest beyond comparison, she did not receive sufficient means from him to provide for his large family and herself, while she expended all her own patrimony. The evidence is indubitable, that in her father's lifetime she frequently came to him, with tears in her eyes, entreating him for market money to supply the table; and after his death her own fortune was expended in part, at least, in the endeavor to live. That she had a very ample estate, which diminished and finally vanished altogether under the incessant inroads made on her purse, is beyond denial. The attempt to show her extravagance by the bills, procured from the various persons with whom Mr. McClurg kept accounts, is only partially successful. An examination of them, and of the testimony adduced with them, shows that many were general for the whole family, while others show a separation between her accounts and his, plainly indicating that he suffered her to pay them herself, and evincing his own unwillingness to be charged with them; altogether corresponding well with the proof that she expended her own estate largely in her own maintenance. The testimony of Dr. Fleming and Chas. H. Paulson, especially, exhibits not only an unwillingness of McClurg to pay debts for her of a proper kind, but a feeling also toward her very repulsive and calculated to wound and annoy. On

many occasions his conduct was severe and unkind, especially at a time when death had entered the household and taken away her children, and was accompanied with a roughness evincing no sympathy or just appreciation of her relation to him. If the testimony of servants can be relied on, when her boy was born, she was left quite alone, with no attention from his family, without the presence and countenance of her husband so much looked and longed for by a wife at such a time, and without a supply of little comforts which are the solace of sickness. From the same source we learn that her entertainments were few, and that she was but little the mistress of a house where his daughter more than shared her empire. If her sisters are credible, he was overbearing and penurious, denying her necessary comforts, disagreeing with her about her religion, refusing her relations permission to visit her, and shutting the door against them (with a single exception) while her boy was on a bed of long and languishing sickness. For four years she nursed him, often denied (they say) the delicacies necessary for his comfort, until he died a patient little sufferer; and even then the painful reminiscenses did not cease with death, but followed him to the cemetery, the sale of the cemetery lot and the removal of his remains. Doubtless many of these things had palliating causes, and some resulted from her own state of mind; yet, when all are bound together into a single fagot of proof, they show that he was habitually unkind, and made her home uncomfortable and unhappy. This state of things, and this condition of feeling, must, therefore, be taken into the account in considering his offers to provide a home for her: May *v.* May, 12 P. F. Smith 212.

The offer contained in his letter of March 8th 1865, on its face refers to Mrs. McClurg's note of January 30th 1865, asking him his intention as to providing her a home. His reply of the same day (January 30th) displays a feeling on his part not adapted to invite her return to the same roof with him. Indeed he says in so many words: "I have not, nor have I ever had, any intentions in the matter." This is followed by the formal offer of the 8th of March 1865, in which he prefaces his offer with a recital of grievances calculated rather to repel than to attract her. That was followed by another without date, but purporting to be written some eighteen or twenty months afterwards. The tone of this letter is rather kind, and displays much better feeling, and had it not been both preceded and followed by bitterness and ill feeling, more weight would have been due to it. The next letter is the one signed by the counsel of Mr. McClurg, and dated August 10th 1868, during the pendency of the proceeding. It is, however, evidently the mere formality of legal instruction, and is combated by his own conduct too strongly to be looked upon as a cordial and sincere invitation to a home. Just one week

afterward, Mrs. McClurg, in company with S. McLain, Jr., called to see Mr. McClurg on the subject.   Conversation had proceeded but a few minutes until he said something sharp to her, which brought her out also.   A controversy arose, and in it he charged her with a want of truth, and he said he could expose her if he would.   He went so far as to say that her sisters, Mrs. Irvin and Mrs. Jones, had sworn lies; that she herself and the Rev. Thomas Guthrie, D. D., had told lies, and asked McLain if he knew that she was a church member, and then said she played cards on Sunday.   His manner of talking, says the witness, was abusive of her and her connections, and he expressed the belief, in answer to a question, that they could not live harmoniously together.   About this time, on the examination of a Mr. Murtrie, a witness, who testified that McClurg had said Mrs. McClurg was not honest and her word not reliable, McClurg interrupted him, saying, " Yes, I said that, and I repeat it now."

In view of all these facts we are not able to say that the court below erred in disregarding these offers to return.   It was a question for the court, whether the offers were made in all due sincerity, and with an intention bonâ fide to perform his marital duty.   An unmeaning formality cannot always be accepted as a genuine act. It may have the hand of Esau, and yet betray the voice of Jacob. It must be remembered that the desertion was on his part, not hers, and was fully proved.   Her right to a divorce from bed and board and a maintenance had been fully established, and it was not to be arrested by a merely formal offer of reconciliation, contradicted by all the evidence as to its motive and its good faith.   If the court believed it to be insincere, as they evidently did, it was due to Mrs. McClurg to give her the benefit of the decree to which she was entitled, leaving the defendant to his remedy under the Act of 26th February 1817, by petition or libel to offer to receive and cohabit with her again, and to use her as a good husband ought to do.   Then the case would be brought fully within the power of the court, and justice could be done to both parties. It would be subversive of all just administration of justice, if when a case is clearly made out against the respondent, entitling the plaintiff to a decree, he could avoid it by the mere magic of a few words, without evidence of their frankness, and of his intention to remove the cause of complaint in truth and sincerity of purpose.   Analogies may be found in the following cases: Kinsey v. Kinsey, 1 Yeates 78; Hollister v. Hollister, 6 Barr 452; Breinig v. Breinig, 2 Casey 161; May v. May, 12 P. F. Smith 206.

In respect to the alimony, however, we think the decree of the court below is not supported by the testimony.   In view of McClurg's present circumstances, the sum seems to be excessive. It is fully shown that he is the owner of valuable property held

in the names of others, but it is also proved that the rentals of a large proportion are appropriated to the payment of creditors whose claims are fixed upon the estate. It would seem, taking all the evidence, that the annual profits or income of the property available to him lies between $2500 and $3000, the rest being appropriated to his debts. The Act of 1817 allows but one-third of the husband's annual profits or income from his estate or his labor, as the *maximum* of alimony. Taking $2700 as the probable average income, one-third of that sum is $900, and is all that can therefore be allowed under the act at the present time. There is nothing to prevent a greater allowance hereafter, as his income shall be increased by the payment of the debts charged upon his estate, and to which his equitable title is subordinate, if an increase should be found to be necessary for Mrs. McClurg. This can be effected by the terms of the decree itself. Breinig v. Breinig, 2 Casey 161, is not opposed to the exercise of this power. That was an appeal taken upon a trial before a jury, and the question in this court arose upon exceptions to the ruling of the court on the trial, the orders made during the progress of the proceeding, and the decree founded upon the result of the trial. When, in discussing the exceptions to the alimony and expenses allowed, Black, J., remarked : " If there be error in this, we have no authority to correct it," he did not mean to deny the *power* of the court to correct an error on this subject in a proper case. He evidently referred only to the state of the case itself, for he immediately added, " There is nothing on this record, by which we can know whether the alimony was too much or too little." It is to the expenses of litigation he referred afterward, when he said the amount is a question for the discretion of the court. The orders which a court makes of expenses to be allowed to a wife, during the proceeding, are in their nature interlocutory and often made upon the hearing of oral testimony, and as a general rule are purely within the sound discretion of the court. An abuse of this discretion might be reached in order to effectuate justice. But the order for alimony is part of the final decree, and when brought up by appeal, with all the evidence, is necessarily the subject of the jurisdiction of this court. The Acts of 22d April 1822, and 16th June 1836 (Brightly's Purd. 928), give express jurisdiction " to examine and correct any and all manner of error of the justices, magistrates and courts of this Commonwealth in the process, proceedings, judgments and decrees, as well in criminal as in civil pleas and proceedings, and thereupon to reverse, modify or affirm such judgments, decrees and proceedings, as the law doth or shall direct." This authority cannot be taken away except by express terms or irresistible implication, note *a*, Brightly's Purd. 928. And the act giving the appeal in divorce cases, says it shall be prosecuted in the usual manner,

which is *de novo* on the testimony taken in the cause. The only exception is where a fact has been found by a jury trial according to the act, when this court will not re-try the fact: Andrews *v.* Andrews, 5 S. & R. 374. The evidence being before us on the appeal, we are bound to exercise the jurisdiction given to us, and to correct any error brought to our notice for review. Therefore the decree of the court below is affirmed, excepting as to the alimony allowed to the plaintiff, which is reduced to the annual sum of $900, with leave to move the Court of Common Pleas hereafter to increase the same upon sufficient cause to be shown, and the costs are ordered to be paid by the appellant.

WILLIAMS, J., dissented.