## Lambright *v.* Lambright, Appellant.

*Divorce—Desertion—Evidence—Insufficiency.*

In an action of divorce on the ground of desertion, a decree is properly refused, where the evidence fails to establish that the desertion was willful and malicious and persisted in for two years.

Where the libellant deliberately locked the respondent out of his house, and refused to provide for her, she cannot be held to have deserted him, particularly when at various times she offered to return to him.

Argued April 20, 1926. Appeal No. 141, April T., 1926, by respondent, from decree of C. P. Lawrence County, June T., 1923, No. 72, in the case of William A. Lambright v. Rhoda E. Lambright. Before PORTER, P. J., HENDERSON, TREXLER, KELLER, LINN, GAWTHROP and CUNNINGHAM, JJ. Reversed.

Libel in divorce.  Before EMERY, P. J. .

The facts are stated in the opinion of the Superior Court. ·

The case was referred to Mark L. Rabinovitz, Esq., as Master, who recommended that a divorce be refused.  On exceptions to the Master's report the court sustained the exceptions, and granted a divorce.  Respondent appealed.

*Error assigned* was the decree of the court.

*James A. Chambers,* and with him *Thomas W. Dickey, for appellant.*

*S. L. McCracken,* and with him *W. E. Porter,* for appellee.

OPINION BY TREXLER, J., July 8, 1926:

The plaintiff seeks a divorce from the defendant, alleging desertion.  The master recommended that the divorce be refused and the lower court granted it.

These people have been married since 1880, and reared seven children.  The allegation is that the desertion occurred on the 5th of July, 1921.  The relations between the parties had not been very pleasant before that time, and the master found that the leaving of the respondent from the home of the libellant was justifiable owing to the bad treatment which the husband had accorded his wife.

We base our conclusions upon the lack of satisfactory evidence that the desertion, apart from prior treatment, was willful and malicious, and persisted in for two years.  The circumstances of the alleged desertion were that the libellant and some of the family came to the house and met the libellant on the front porch.  After a short time, they had occasion to go to

visit near by and when the wife and some of the family got near the house she saw her husband going in and locking the front door. She tried to open and requested her son-in-law to try, but neither could. She then went to her daughter's home, but her son-in-law went around the corner of the house and had quite a long conversation with the husband who was at the back door.

He testifies that he was standing at the rear door when they came back and found the front door locked and that they started yelling, "He locked us out, he locked us out." It seems he made no effort to let them know where he was or to correct the impression made by his act in locking the door as they were nearing the house.

The next day, she returned to the house, but found the doors locked. She stated that it was never their custom to lock their doors, but on this occasion, they were all locked, even the windows. This return by her, negatives the idea of desertion on her part. It seems that he had on former occasions locked his wife out of the house, once for several weeks, and one time just one hour before she was about to be confined. The daughter testifies that in July 6, 1921, the day following the alleged desertion, her father told her that her mother could not come back. Respondent testifies, and she is corroborated, that she told him subsequently that she was willing to go back and live with him, but owing to her advanced age, and the fact that she had worked hard all her life and was just about played out, she would require some assistance in the house, but he refused and said he would not get any body. She told him he could get his son, Albert, to stay, as she did not want to be alone. This he refused, saying he could not afford it. They had $900 in bank, had a joint account of $700 which he persuaded his wife to turn over to him. They also own the house in which they

lived. He was earning about $90 a month. On the other hand, he wrote her two letters in which he asked her to return. The one invitation to resume relations, seems to be conditional, "They would go to New Castle and fix up their troubles." The last was in September 15, 1924. If we take both stories, it seems each of these parties was sometimes willing and sometimes unwilling to resume relations, but they were never willing to do so at the same time. In considering the bona fides of the offer, his former attitude of mind and his treatment of her, may be considered. McClurg's Appeal, 66 Pa. 366, 372.

Referring again to the instance of July 5th, it would seem that if he went in and locked the door when he saw his wife coming, it would be evidence that he did not desire to have her in the house. The sum of the testimony leaves one's mind in a state of uncertainty such as would cause one to hesitate to approve the granting of a divorce. Marriage should never be dissolved without clear proof of imperative reasons. We have only referred to some of the testimony, it was not all one-sided, by any means, but taking it as a whole, we do not think it has been shown that there was a willful and malicious desertion, and we therefore refuse the divorce.

The assignments of error are sustained, the decree of the court granting a divorce is reversed, and the libel is dismissed, the appellee to pay the costs.