Gerhart *v.* Gerhart, Appellant.

Argued October 6, 1947. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and FINE, JJ.

*Charles M. Bolich,* for appellant.

*S. D. Frederick,* with him *Snyder, Wert & Wilcox,* for appellee.

OPINION BY ARNOLD, J., March 8, 1948:

The master recommended a divorce on the ground of indignities. The court below dismissed exceptions, entered a decree and the wife-respondent appealed.

The parties were married in 1932 and at the time of the master's hearings were approximately 39 and 37 years of age, respectively. They lived in Allentown from 1934 until September 29, 1944, when the respondent left the libellant and the three children in their common home. She then went to the home of her sister in another part of Allentown. The children were first placed in a charitable institution, but were eventually taken by the respondent.

While the appellant raises a large number of questions in this appeal, the primary issue is the credibility of witnesses, particularly the parties themselves. It is also claimed that the master "overlooked" testimony favorable to the respondent.

It cannot be denied that the libellant is justly entitled to a decree if his testimony and that of his eight

witnesses [1] is believed. By the evidence it appeared that he worked as a butcher at a meat plant in Allentown, where, prior to union organization, he was often compelled to work long hours that kept him away from home from five o'clock in the morning until nine or ten o'clock at night. Because of this he had no time to devote to taking his wife out for entertainment. Commencing in 1933 and occurring three or four times a week, and becoming an almost daily occurrence after the libellant became active in his union, the respondent charged him with running around with other women. These accusations were made in the presence of their children, of relatives, neighbors and members of the general public. They were persisted in at the master's hearing, and the charge was principally concerning one whom we shall refer to as Miss A. B., who testified in denial.[2] The libellant averred that he had neither improper relations nor even any interest in other women. He found it difficult or impossible to put up with her tirades and accusations, and tried to coax her to desist. She persisted and this led to constant dissension and arguments, interspersed with her frequently calling him bad names,[3] not only when they were alone but in the presence of their children and of other people. She induced the children to call him a "dirty rat" and a "bastard", and to say that he was running around with women.

He gave her his pay of about $50.00 a week, which she handled exclusively, buying his clothes and giving him carfare and small items, so that he had about $1.00

---

[1] Julius Schrampf, N.T. 56; Harry L. Hoelflich, N.T. 77; Mrs. Lucetta Berger, libellant's sister, N.T. 84; Mrs. Anna Undercuffler, libellant's sister, N.T. 99; Harold W. King, N.T. 119; Miss A. B., N.T. 137; Mrs. Edith Martucci, libellant's sister, N.T. 148; Mrs Minnie Andrews, next door neighbor of libellant, N.T. 152.

[2] N.T. 137.

[3] "God damn good for nothing", "rotten son-of-a-bitch" and "bastard"; "God damn no good husband", "no good son-of-a-bitch", "dirty rat", "black bastard", "whoremaster" and "black son-of-a-bitch."

or $1.50 a week for his own use. When he asked for more, she replied: "What the hell do you need money for?" During the two years immediately prior to the separation it was impossible for him to have any contentment or peaceful living, because of her quarreling with him over his union activities and his alleged misconduct with other women. As her conduct grew progressively worse, the libellant for a week obtained some relief by taking his night's rest on the floor of his sister's house. For the same reason he slept in his automobile. She "would just keep on [so] that the man [libellant] had no rest in the house."[4] Her malevolence against the libellant was also exhibited in hiding the license plates of his car to prevent its use; by hitting him with a milk bottle; by smearing iodine on his shirt to make it appear that he had forced her to take it, although she had done so of her own volition. She objected to the libellant's sisters visiting their home and called them names, resulting in their withdrawal from their brother's society. They would not speak to him until after this court action was commenced. However, after libellant's sisters withdrew from his companionship, the respondent constantly visited them, and in 1943 she said to one of them that the libellant was a "dirty rat" and "dirty son-of-a-bitch." She demonstrated to libellant's friends that she did not want them in her home. She wrote cards to, and telephoned one of them so that the latter's job and own family relations were jeopardized. On one occasion she told libellant's sister that she was "having abnormal family relations" with the libellant to avoid children, and that she hated him. She called the police to their home at various times when she, herself, had precipitated the quarrel. Occasionally she struck the libellant. On the night of September 29, 1944, the parties had a quarrel stemming from respondent's accusation that the libellant was running around with other women. She then left the libellant and the children and

---

[4] N.T. 153.

went to her sister's home in Allentown, returning later for her clothes.

Respondent's case was conducted on the theory that the best defense is an offense, and her testimony shows that she attacked practically every witness called against her, freely charging them with adultery, bastardy and marital "cheating". She was belligerent and intractable. In no fewer than five occasions [5] protests were made concerning her conduct toward opposing witnesses. On at least one occasion she tried to prompt or guide witnesses testifying for her.[6] Her conduct was not the result of ignorance. In the charges which she made against her husband and his witnesses she was reckless and unrestrained. Other than concerning the charges that A. B. was intimate with her husband, she was practically uncorroborated except as to minor matters. The A. B. matter will be referred to later. It constitutes the crux of the case. The respondent testified that she had never seen the libellant and A. B. together; but had been told that they were intimate. She called no witness who had so reported to her. It was not the subject of controversy that A. B.'s sister telephoned libellant and asked him to meet her at the railroad station one evening when it was raining. The libellant drove A. B. to her home and did not enter the house. The sole justification for respondent's charges rests upon an alleged admission by A. B. on September 25, 1945, at her house, when respondent and her sister, Miss Schlegel, requested Rosie George and a girl whose last name is not given, but who was called "Gladiola",[7] to accompany them to the house where A. B. lived with her sister. "Gladiola" was not called and remains unidentified and unknown. Rosie George testified [8] that A. B. admitted she "went out" with libellant, but the witness said she did not know

---

[5] N.T. 75, 92, 93, 137, 235.

[6] N.T. 336.

[7] N.T. 251.

[8] N.T. 230.

whether A. B. referred to the railroad station incident or to union business meetings or what.

The only evidence of A. B.'s admission comes from the respondent and her sister, who did most of the talking at the interview. They testified, generally, that A. B. said she frequently visited beer parlors with the libellant; that he often visited at her home; and that she was "intimate" with him. It is remarkable that, if these people thus publicly flaunted their attachment, the respondent was unable to produce anyone who ever saw them together, for it is apparent that the respondent assiduously prepared her defense. The testimony of the respondent and her sister varies in many respects. From a careful examination of the evidence we conclude that it is plain there was no basis in fact for the charge; and that there was not even any foundation for suspicion; nor any evidence that other people were suspicious or suggested anything to the respondent concerning the alleged intimacy. The master had the advantage, which we do not possess, of seeing and hearing the witnesses, and observing their behavior and demeanor. He made a careful, impartial and unprejudiced report, and the weight given to his conclusions is well known: *Smith v. Smith,* 157 Pa. Superior Ct. 582, 43 A. 2d 371. He, too, found the respondent and her sister not to be credible witnesses.

We may add that the record of a *conviction* of adultery cannot be offered to affect a witness' credibility on some other matter. Much less can charges of misconduct, such as were indulged in in this case by the respondent, affect the credibility of libellant's witnesses. Such testimony was grossly improper, for the grounds for affecting the credibility of a witness are well known: *Marshall v. Carr,* 271 Pa. 271, 273, 114 A. 500.

To go more fully into the facts in this case would be to epitomize the able report of the master and is unnecessary.

Appellant suggests that since the sister of the libellant wrote the master a letter attempting to influence him, the case must fail. There is no proof or suggestion that the libellant had anything to do with this. The master states that he was not affected by it, and also calls attention to improprieties on the part of the respondent. Appellant claims that, since a witness called by the libellant testified that the respondent had requested him to cut the tires of libellant's automobile, and thereafter recanted, this weighs heavily against the libellant. There is no testimony that the libellant attempted to procure the witness to swear falsely, just as there is no testimony as to whether or not the respondent improperly secured his recantation. Appellant alleges that a witness for the respondent, Harry Nicholas,[9] testified that he answered the telephone and a *voice* which he identified as being that of libellant's sister, asked him to testify falsely for the libellant.[10] The sister denied any such telephone conversation. No one alleges that the libellant was concerned in it, and he testified that he knew nothing of it. The sister denied flatly having made such a call.

Lastly, we have considered the effect of the support order in favor of respondent and her children and against the libellant, and the surety of the peace case in which libellant was released on his own recognizance, but they are not controlling here.

Decree affirmed.

---

[9] N.T. 221.

[10] The person talking to him said she was Mrs. Berger (libellant's sister.)