Vautier *v*. Vautier, Appellant.

Argued December 14, 1939.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and
HIRT, JJ.

*David E. Groshens,* for appellant.

*Harold D. Saylor,* for appellee.

OPINION BY BALDRIGE, J., January 30, 1940:
In this action of divorce the husband charged his wife

with cruel and barbarous treatment and indignities to the person such as to render his condition intolerable and life burdensome. The master appointed to take testimony concluded that it was insufficient to support the charge of cruel and barbarous treatment, but recommended that a decree be entered on the ground of indignities to the person. Exceptions to the master's report were dismissed by the court and a decree of divorce was entered.

We have repeatedly held that the report of a master is advisory only, and that it is our duty to examine the testimony carefully and make our independent finding. A report of a master, who has had the advantage of seeing and hearing the parties and their witnesses, is, nevertheless, to be given fullest consideration: *Lyons v. Lyons*, 116 Pa. Superior Ct. 385, 176 A. 792.

While we are mindful that annulling a marital contract is a very grave question, not alone to the parties but to the state, we have reached the conclusion that the libellant has successfully carried the burden of showing that he is entitled to a decree.

We will not detail the evidence, although we have read it all and considered it carefully, tending to show the indignities visited upon the libellant by the respondent. Suffice to say, it shows that the respondent was, as charged, guilty of a course of conduct of nagging, the use of abusive language, and making humiliating charges in the presence of others, without provocation, amounting to indignities under our statutes. (23 PS sec. 10).

The parties were married December 12, 1916, and had two daughters, 17 and 9 years of age. They lived together until December 12, 1938, when, the libellant contends, he was compelled, for his health and peace of mind, to withdraw from the home.

The libellant is the cashier of the Tioga National Bank and Trust Company in Philadelphia. His other

interests are principally confined to religious work, collecting stamps, and reading. It appears that the wife, as well as the husband, had deep religious convictions and was active in church affairs. The libellant stated that he believed his wife was "fanatically inclined along religious lines." He conducted a young men's Bible class at his home, to which the respondent objected. He was also a member of an orchestra which played sacred music solely. It was composed of young men who met at his home for practice. On different occasions, while libellant was conducting the Bible class, respondent interfered by calling the libellant a "devil," a "liar," a "thief," and a "bastard." Her interruptions compelled the members of the class to change their place of meeting to another home. There were many times when the respondent indulged in charges of this character.

The libellant testified that in September, 1938, while the respondent was engaged in what she called "prayer", she shouted so loudly her charges against him that after she had continued for approximately two hours the neighbors, who were living sixty to eighty feet away, found it necessary to call the police, who requested her to cease the disturbance.

That same month the respondent appeared at libellant's place of business and angrily demanded the keys to the car which he used to take him to and from work, and caused a scene in the presence of the employees of the bank.

In October the respondent caused another scene at the bank by demanding, in the presence of other people, that libellant deliver to her the title papers to the car which she had been using, and pay to her the children's bank accounts, announcing that she was leaving the libellant forever and was going to Akron. He complied with these demands and the car, with one exception, was used thereafter by the wife. Shortly after this incident, the respondent, in an outburst of temper, forc-

ibly detained the libellant when he attempted to leave the house and for four hours indulged in abusive language, struck him twice with her fists, and attacked him with one of her high-heeled shoes. A few days later the minister and two of the elders of the church called for the purpose of effecting a reconciliation, at which time the respondent admitted she had interrupted the Bible class and had attacked the libellant. The wife, however, persisted in her nagging and making charges. Shortly thereafter when libellant was reading in his library, the respondent severely berated him, calling him abusive names. On this occasion, as at other times, she appeared, according to libellant, to be preaching a sermon to him as to his manner of living, and expressed vigorous criticism of his conducting the Bible class.

During the period from September 1936 to November 1938, the respondent was frequently absent with her children, without notice to the libellant, from her home. On a number of occasions she drove the car on long trips to Akron and elsewhere to attend religious meetings, admittedly traveling 60,000 miles during that period of two years. There was testimony that during this time she neglected to provide meals for her husband and to properly care for and maintain the home. There were occasions when he would return from work and find the house closed and would not know for a day or two what had happened to his wife and daughters. By reason of this course of treatment he was unable to bring his friends to the house and was practically required to give up any social contacts that he had. The wife acknowledged that she would go on long trips and, when asked if she went to Akron to attend a religious meeting, answered: "Yes, a wonderful evangelist, miraculous things were happening, people being healed miraculously, dead being raised." Her own testimony thus indicates that she was under the influence of religious illusions.

The evidence tended to show that the respondent, although she did not charge the libellant with being intimate with, or interested in, other women, entertained the view, without any foundation, that he indulged in abnormal and immoral conduct.

The respondent's treatment of her husband was so intolerable that he found it necessary to leave his home, after which the respondent created another scene at the bank, loudly demanding that libellant return, and she then removed his clothes from his automobile which was standing in front of the bank.

The early part of 1939, shortly after libellant left the home, the respondent drove up in front of the house of one of the witnesses where the libellant was visiting, and, in the presence of others, called him a coward and made other insulting reflections. The testimony showed that this course of treatment affected libellant's health, caused him to be, as the doctor testified, "very highly nervous," interfered with his ability to sleep and as a result his weight was reduced from 180 to 160 pounds.

While none of the numerous instances of alleged indignities, taken singly, might be regarded as very serious, yet, when considered together, they constitute such a course of conduct as to render the condition of one of ordinary sensibilities intolerable and life burdensome.

A careful reading of the testimony gives us the impression, as it did the lower court, that the respondent was not a frank or a truthful witness. We are of the opinion that the libellant's statements were reliable and trustworthy, and much of his testimony was corroborated by disinterested witnesses.

We have here a course of conduct on the part of the wife, consisting of unmerited reproach, studied neglect, intentional incivility, manifest disdain, abusive language, and other plain manifestations of hostility and estrangement, not provoked by the husband, sufficient

to establish indignities: *Brown v. Brown,* 124 Pa. Superior Ct. 237, 188 A. 389; *Hess v. Hess,* 131 Pa. Superior Ct. 601, 200 A. 157.

Judgment is affirmed.