Smith *v.* Smith, Appellant.

Argued December 13, 1944. Before KELLER, P. J., BALDRIGE, RHODES, HIRT, and RENO, JJ. (JAMES, J., absent)

*William T. Connor,* with him *John R. K. Scott* and *Hardie Scott,* for appellant.

*Thomas J. Reilly,* with him *Albert H. Pearce,* for appellee.

OPINION BY RENO, J., July 19, 1945:

An intensive and protracted study of this record which includes 996 pages of testimony has produced the conviction that the conclusions reached by the master and the court below must be sustained. Accordingly the decree divorcing the parties for the wife's cruelty and indignities will be affirmed.

The case turns solely upon the credibility of the parties and their witnesses. Depending entirely upon who is believed, the record can be taken to establish satisfactorily, not by a mere doubtful balance of the credible testimony but by a fair preponderance of the proof, that either libellant's charges or those of respondent are true. Although we are not concluded by a master's findings upon credibility, his judgment upon that vital factor is entitled to the fullest consideration, *Lyons v. Lyons,* 116 Pa. Superior Ct. 385, 176 A. 792, and

especially in a contested case. *Fullwood v. Fullwood,* 156 Pa. Superior Ct. 409, 40 A. 2d 876. He possesses an advantage not granted to us. He sees the parties and their witnesses face to face and observes their appearance and demeanor as they testify. We are restricted to the cold type of the record from which temperament and personality have been subtracted. Yet the demeanor of witnesses is the very touchstone of credibility; in the absence of reactions produced by other applicable tests, the appearance and demeanor of witnesses are the litmus by which the presence of truth is revealed. They are trifles light as air, imponderables, but for all that they are luminous integrants which ineluctably enter into the calculation by which trustworthiness is appraised. The spontaneous gesture, the lifting of an eyebrow, the shrug of the shoulders, the intonation of the voice, the flash of the eye, the facial expression,—these are a few of the vital and influential indicia of credibility which the master observes and by which he is guided.[1] The mental and psychological impact of these inarticulate expressions experienced by a master form the basis for a conclusion which, to borrow the telling phrase of an anonymous master, "will depend upon a judgment or intuition more subtle than can be objectively demonstrated": *Briggs v. Briggs,* 145 Pa. Superior Ct. 460, 463, 21 A. 2d 415. Frequently they speak more eloquently and possess greater significance than the verbal utterance which they accompany, yet they cannot be reproduced upon the record submitted to the reviewing court.

The books abound with graphic illustrations of the process by which credibility is determined. We quote only one, *Cavazza v. Cavazza,* 102 Pa. Superior Ct. 312, 315, 156 A. 629. There Mr. Justice Drew, deciding a divorce case while he sat in the common pleas, "noticed carefully" the most important, indeed the pivotal witness, "while she was on the stand." He reported that

---

[1] For a quaint statement of rules for ascertaining the credibility of witnesses, see 70 C. J., Witnesses, §952, note 45 (b).

"her eyes blazed with fury . . . She was a picture of indignation and righteous wrath", and largely upon her testimony he granted a decree. This Court, although it could see the witness only through the trial judge's eyes, affirmed his decree in a per curiam opinion. It is this, the inadequacy of the printed or typewritten record to portray credibility, that inspired President Judge TREX-LER, a master of laconic demonstration, to remark: "The facts of a case only partially appear in the transcript of the testimony": *Com. v. Claney*, 113 Pa. Superior Ct. 439, 442, 173 A. 840.

Therefore, unless the transcript reveals a ground upon which the master's finding of credibility can be impeached, we give his conclusion upon that factor, based upon his observance of appearance and demeanor, the fullest consideration, especially when his report presents a searching analysis of the testimony and indicates that he has given to all the testimony thoughtful deliberation commensurate with the charge. *Fulton v. Fulton*, 142 Pa. Superior Ct. 512, 17 A. 2d 222. Of course, even to the printed record we may and do apply the other standard tests of veracity. We sedulously examine and weigh the record to discover inherent improbabilities in the stories of the witnesses, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehood and the other factors by which credibility may be ascertained. But when the record responds favorably to these tests, when the inanimate record as we read it discloses no sound basis for rejecting the master's conclusion founded upon his observation of demeanor and appearance, we are warranted in accepting his findings.

In the case at bar, the master candidly reports that he has been troubled with this factor of veracity. He reports that he "was not impressed by the greater part of the testimony nor as to the truthfulness of the parties and certain witnesses, both of the libellant and respondent." He has not specified which testimony has been re-

jected, but from his elaborate analysis of the testimony, classified under heads corresponding with. the charges contained in the bill of particulars, with separate findings and conclusions for each charge, we have been able to ascertain the testimony which he found credible. This testimony we have scrutinized in the light of the other standards at our command and, assuming that his conclusions upon the credibility of the witnesses as he saw and heard them are correct, we have not been able to find in the transcript of the testimony any solid ground which justifies a refusal to accept his ultimate recommendation.

It must be conceded that, having determined that libellant and his witnesses shall be believed, the record contains sufficient testimony to support the decree. The record is a dreary chronicle of marital turbulence. It was libellant's third marriage and respondent's second. They went through a form of marriage ceremony before respondent was divorced from her first husband, and the legal marriage occurred after their daughter was born and respondent had been divorced from her first husband. From the very beginning of the legal marriage, their home must have been a place of almost savage violence and incessant din. Respondent's physical attacks upon libellant were frequent and violent, furious and wild, and these, with her continued and persistent affronts, demonstrate that she was literally filled with hatred. To state merely in summarized form the many distinct acts of cruelty and the long and persistent course of conduct upon which is based the finding of indignities would require several pages of our official reports. We forbear from imposing this burden upon an already heavily laden profession. See *Waltier v. Waltier,* 154 Pa. Superior Ct. 495, 36 A. 2d 171.

In this tangled maze of contradictory evidence one fact stands out as clear as Mars at perihelion. Her long, intimate and public association with a Philadelphia professional man could be readily spelled out, if other

testimony were lacking, upon the admissions contained in her own testimony. Although she contends that their relations were innocent and had legitimate business objectives, one need entertain no illusions concerning its purposes. It constituted an indignity, *McKrell v. McKrell*, 352 Pa. 173, 42 A. 2d 609, even though it began after the parties had separated. *Wick v. Wick*, 352 Pa. 25, 42 A. 2d 76. This conduct, added to her other numerous affronts, certainly establishes indignities to the person of her husband.

Decree affirmed.