Uhlinger *v.* Uhlinger, Appellant.

Argued April 12, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Walter J. Wagner,* for appellant.

*Edward A. Tobias,* with him *Alice D. Tobias* and *Tobias & Weilersbacher,* for appellee.

OPINION BY ROSS, J., September 26, 1951:

On October 4, 1949, Roy H. Uhlinger, Sr. (hereinafter referred to as the plaintiff) filed a complaint in the Court of Common Pleas of Allegheny County praying for a decree of *absolute divorce* on the grounds of indignities to the person and cruel and barbarous treatment. Ten days later, on October 14, 1949, his wife, Frances E. Uhlinger (hereinafter referred to as the defendant) filed a complaint praying for a decree of divorce *from bed and board* on the same grounds. The two actions were consolidated for trial and were heard in the court below by Judge KENNEDY sitting without a jury. A decree of divorce was entered for the plaintiff on the ground of indignities and the defendant's complaint was dismissed. From the decree of divorce and from the order dismissing her complaint, the defendant has taken these appeals.

The parties were married in Pittsburgh on March 25, 1948. At this time the plaintiff was in his early sixties and the defendant some 20 years younger. It was not the first marriage for either party. The plaintiff was a widower, the wife to whom he had been married for 30 years having died in March of 1947. Of plaintiff's marriage to his first wife were born three children, Roy, Jr., Marilyn and Vivian. Roy, Jr. was married and had his own home, but the girls, Marilyn and Vivian, though of legal age, resided with their father at his home in Mount Lebanon Township, where

he had resided for 25 years. For the defendant, the marriage to the plaintiff was her third. She had been married while quite young, and of this marriage had one daughter, Eleanor. Defendant's second marriage, sometime in the early 1930's, was to Brigadier General William R. Dunlap, who died in 1940. One child, Jenny Lou, was born of this marriage.

The plaintiff had been a member of the National Guard of Pennsylvania continuously from 1911 until December 1949. He had been on active service with the National Guard on the Mexican Border in 1916 and had served in both World Wars, being discharged in 1949 with the rank of lieutenant colonel. He had for many years been an employee under the United States Army Engineers for the Pittsburgh district and continued in this employment after his marriage to the defendant. The defendant had been a teacher in the public schools of the City of Pittsburgh prior to her marriage to General Dunlap. After his death she resumed her work as a teacher and continued in that occupation up to the time of her marriage to the plaintiff. After a short wedding trip the parties took up residence in the plaintiff's Mount Lebanon home. Until the departure of Marilyn and Vivian under circumstances related later in this opinion, the household consisted of the plaintiff and his two daughters and the defendant and her daughter, Jenny Lou.

As to the various incidents said to constitute indignities to the person, the record discloses irreconcilable conflicts in the testimony at every turn of the page. Judge KENNEDY concluded that the credible testimony was adduced by the plaintiff and his witnesses, and his judgment in this particular is entitled to the highest consideration in an appellate court. *Bobst v. Bobst,* 357 Pa. 441, 54 A. 2d 898; *Handy v. Handy,* 163 Pa. Superior Ct. 49, 60 A. 2d 415. We recognize, of course, that it is our duty to examine carefully the

testimony and base our conclusion on our own independent judgment; yet at the same time we realize that the judge who saw the witnesses, observed their manner, and heard them testify, had a better opportunity to determine their credibility than we, who must rely upon what appears in "cold type". *Tanner v. Tanner,* 159 Pa. Superior Ct. 637, 49 A. 2d 875. We have read with care the conflicting testimony of the parties and their respective witnesses, weighing such testimony to discover inherent improbabilities, inconsistencies and contradictions, bias and interest, opposition to incontrovertible physical facts, patent falsehood and other factors by which a finding upon the issue of credibility may be tested by an appellate court. Cf. *Smith v. Smith,* 157 Pa. Superior Ct. 582, 43 A. 2d 371. We are agreed that the record discloses no compelling reason to reject the conclusion of the court below with respect to credibility. Consequently, our review will be confined mostly to plaintiff's evidence.

It is apparent that the presence of the plaintiff's daughters was a source of irritation to the defendant almost from the first; and, in late July of 1948, she ordered them from the house. Though there was no opposition to the defendant's decision, she created a disgraceful scene in the presence of Albert Wareck, a friend of Marilyn, at the time of the eviction of the girls. The departure of Marilyn and Vivian did not lead to domestic harmony. The defendant continued to criticize them almost daily in absentia, and was equally critical of the plaintiff's late wife. She expressed dissatisfaction with the neighborhood in which they lived, with the neighbors, with the schools of the district, the morals of the local high school children and with the township police force. As a result of his wife's constant carping the plaintiff discontinued his activities in connection with various fraternal and civic organizations, and ultimately gave up attendance at Sun-

day school because, in the opinion of the defendant, it was merely a subterfuge to enable him to visit with his son. The evidence adduced by the plaintiff and his witnesses portrays the defendant as not just a nagging wife but one filled with contempt and hatred for the plaintiff and for his daughters. Her obvious antipathy to his daughters, of course, is not "indignities to the person" of the plaintiff, but it is indicative of her temper and general disposition.

According to the plaintiff's testimony, the defendant on innumerable occasions, both public and private, falsely accused him of drunkenness. He testified also that she on numerous occasions said to him, "You are worse than the rest of them. I don't know why I ever married a dumb Dutch slob like you"; and in answer to the question, "Did she call you any other names that you can recall?" the plaintiff testified as follows: "Well, she belittled my service and said that I should be ashamed to accept my money when I was in the service. I don't know why. And that out in the National Guard General Dunlap had carried me right along. Q. Who is General Dunlap? A. He was her second husband. For a good many years he was Commander of the National Guard Regiment, 176th Field Artillery, of which I was Battalion Commander."

Upon at least two occasions the plaintiff was struck by the defendant. The first attack climaxed a quarrel precipitated by the defendant in the home of friends, the McClays, on January 6, 1949. The defendant on this occasion insisted on reciting private financial affairs in the presence of the McClays; and, upon the return of the parties to their home after the visit, struck the plaintiff in the face with a shoe, breaking his glasses, and continued to vilify and abuse him physically and verbally. The defendant denied the incidents in the McClay home and what followed, and claims the plaintiff was intoxicated and the instigator of the argument.

McClay, however, testified that the plaintiff was not drunk and that it was the defendant who started the argument.

On August 27, 1949, the defendant for no reason, according to the plaintiff, commenced an argument with him in their home. Upon this occasion, she threw several objects at him, finally hitting him on the head with a heavy ash tray, causing a deep gash and a considerable loss of blood. The defendant admitted throwing the ash tray but claims she did so under the stimulus of a vile and opprobrious name which the plaintiff called her and in self defense. The court below concluded that the plaintiff's version of the incident was the truthful one and the record supports him in that conclusion. Several other incidents serve to illustrate the atmosphere in which the plaintiff found himself after his marriage to the defendant. In July of 1949 he was involved in a minor accident while driving a Chrysler car which had been purchased by him after his marriage to the defendant and titled in her name at her insistence. When the defendant learned of the accident, she launched a stream of abuse at him in the presence of a young attorney who had driven plaintiff to his home after the mishap. Plaintiff's version of this scene was corroborated by the attorney. On the evening of August 28, 1949, the plaintiff returned home from a visit to his children. The defendant had locked him out making it necessary for him to locate a ladder and climb up to his bedroom window. On the next evening the plaintiff again visited with his daughters and, upon his return, the defendant came to his room and began to abuse him with words and also physically. He testified that he protected himself by holding the defendant's arms while remonstrating with her. She then called the police and stated that her husband was drunk and was beating her, and asked for help. The officer who answered this call, Lieutenant Stanley G.

Cain, was called as a witness for the plaintiff. He testified that he found the plaintiff in bed; that he was not intoxicated, and that the defendant, while "quite upset", showed no sign of any physical abuse other than a bruise on her upper arm that looked as though she had been held "real hard".

The plaintiff's health deteriorated noticeably after his marriage to the defendant, and he attributed the impairment of his health to the physical and mental abuse heaped upon him by the defendant.

Indignities cannot be defined generally but must depend upon the particular circumstances of each individual case and the position in life, character and disposition of the parties. It is well recognized as the course of conduct which is humiliating and degrading to the innocent, injured spouse. *Konosa v. Konosa*, 165 Pa. Superior Ct. 140, 67 A. 2d 662.

Life with this defendant was without doubt a frustrating and humiliating experience for the plaintiff. She subjected him to treatment which was certain to debase any person of ordinary sensibilities. She exhibited an ungovernable temper and hate by physical attacks upon him. That the plaintiff's health was impaired by cohabitation with the defendant is in itself strong supporting evidence of indignities. *Clark v. Clark*, 160 Pa. Superior Ct. 562, 52 A. 2d 351; *Bock v. Bock*, 162 Pa. Superior Ct. 506, 58 A. 2d 372.

The plaintiff appears to have made every effort to placate his wife. He agreed that his daughters should leave the house, he gave up many if not all of his outside activities, and would seem to have adopted a conciliatory attitude on the many occasions when the defendant chose to subject him to her vitriolic outbursts.

We are agreed that this defendant has displayed the hate, contempt and settled estrangement necessary to entitle the plaintiff to a severance of the marital ties on the ground of indignities to the person. The com-

plaint of the defendant was quite properly dismissed in that she has completely failed to establish herself as the innocent and injured spouse.

Decree granting a divorce to the plaintiff on the ground of indignities, and the order dismissing defendant's complaint are affirmed.