369 A.2d 1297

**C. Burtis COXE, Appellant,**

v.

**Doris B. COXE.**

Superior Court of Pennsylvania.

Argued March 17, 1976.

Decided Nov. 22, 1976.

W. Robert Landis, West Chester, for appellant.

V. Clayton McQuiddy, III, West Chester, for appellee.

Before WATKINS, President Judge and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

CERCONE, Judge:

This is an appeal from an order of the Court of Common Pleas of Chester County, dismissing a complaint in divorce. The court overruled the master, who recommended that plaintiff-husband be granted a divorce.

Appellant-husband married appellee in November of 1952. The parties have two children, born in 1955 and 1958. Appellant seeks a divorce on the ground of indignities. There is no dispute that his testimony is sufficient at law to support his claim. The sole issue before this court is that of credibility.

██ Plaintiff-appellant contends that the master's findings, absent "gross irregularity or mistake of law," are binding on the court below and on this court. This argument is without merit. It is well-settled that in divorce cases, the evidence must be considered de novo at every stage of review; and that review extends to questions of credibility. *Gehris v. Gehris*, 233 Pa.Super. 144, 148, 334 A.2d 753 (1975). Such a review of the record in the instant case sustains the lower court's characterization of plaintiff's testimony as "replete with inherent improbabilities, inconsistencies, and contradictions." Both husband and wife had considerable and conflicting complaints about each other concerning conduct, attitude and familial responsibilities.

Plaintiff, who throughout the marriage worked at two jobs, testified that defendant berated him publicly and privately for not working harder and making more money. When pressed for examples of such conduct occurring in public, he described two incidents, each in front of a different couple. He described the relationship to

these couples as having been a close one from 1964 to the present. He stated that he had not sought to have them testify because of the close personal relationship. Yet, when asked the present whereabouts of one of the couples, he replied that he did not know.

About half of plaintiff's complaints relate to persistent verbal abuse to which he allegedly was subjected by defendant. A review of his testimony in this respect reveals that he claims to have been insulted in one way or another from 39 to 45 times a week for several years. As the court said in *Cunningham v. Cunningham*, 119 Pa.Super. 380, 381, 181 A. 458 (1955):

> "The fact [of living together] may . . . be taken into consideration in passing on the degree or severity of the alleged indignities which render the libellant's condition *intolerable* and his or her life *burdensome*. If one physically and financially able to leave the common home continues to stay there, it may have some bearing on the *intolerableness* of his condition and the *burdensomeness* of his life." (Original emphasis.)

The master found as a fact that on June 1, 1972, defendant rhetorically questioned plaintiff's virility and parentage, in unsavory terms, and told him to take his things and leave the marital home with his girlfriend. Had plaintiff's home life truly been as miserable as he portrayed it, it is hard to believe that he would wait for this inherently improbable edict before leaving.

The rest of plaintiff's complaints, aside from some referring to isolated incidents and to conduct not constituting indignities, allege that defendant refused to make coffee for him in the morning, usually refused to make lunch for him when he was able to come home for that meal, and, on those occasions when he could come home for dinner, customarily insulted his palate with TV dinners, meat pies, and leftovers. With respect to the coffee complaint he testified:

> ". . . [W]ith much persuasion on my part she did make coffee. I would have to beg and plead to

have coffee made. I had my office underneath in the home. I would have to get the ball peen hammer and hammer on the joist to move her to get out of bed to get coffee, after being down there from seven thirty to work . . . I made it two-thirds of the time and she made it one-third with much persuasion."

He added on further examination that he resorted to hammering on the floor joist under her bed two or three times a month.

Defendant's testimony on the subject of coffee was as follows:

". . . [T]he children always took an early school bus when they went to school. I usually got up with the children, or a little before. The first thing I did when I got up, for the most part, was put on the coffee pot. It was a percolator. It took about ten minutes. For many years, I was in a car-pool with other mothers on the road. It took about ten minutes to take the children to the school bus stop. It was about a mile away.

"When I came back, the coffee would be ready or be done, and I would go back, and if he wasn't awake I would call him."

We agree with the lower court that the wife's version of the coffee problem is more believable. Her denial that she ever refused to make him lunch or dinner is at least as credible as his testimony to the contrary.

Plaintiff alleged that when he tried to take afternoon naps, defendant deliberately interfered with his attempts to sleep by running a vacuum cleaner near the bedroom. Defendant admitted that her vacuuming time occasionally coincided with his naptime, but denied any deliberate interference with his sleep. We regard plaintiff's inference of a design to disturb him as pure conjecture; from what the record tells us of his temperament, we believe that defendant would no more deliberately interrupt his slumber than she would poke a hibernating bear.

When asked about the effect of defendant's conduct on his day-to-day emotional state, plaintiff replied:

"The . . . effect it had was I prayed to the Supreme Being that he would remove this witch out of the picture many, many times, and cast the devil from her."

Early in the hearing plaintiff's counsel observed, "The problem here is obviously Mr. Coxe is nervous and upset, and he is having difficulty in being responsive to the question." While ordinarily it would be unfairly conclusory to consider such nervousness a reflection of the guilty conscience of one giving less-than-truthful testimony, the instant plaintiff is no shrinking violet; he is a District Justice of the Peace with fourteen years' experience in the taking of testimony, has a successful career as an insurance agent, and has worked as a salesman and bill collector. These experiences involve considerable human contact; his emotional state in court is not easily attributed to a nervous disposition or to the unfamiliarity of his surroundings.

The best that can be said of plaintiff's testimony is that parts of it are believable enough to be accorded equal weight with defendant's denials. We are asked to believe that plaintiff, an ambitious and aggressive man, endured daily abuse in prolonged silence punctuated only by an occasional tap of the ball peen hammer and a periodic plea to the Almighty to remove the "witch" from the picture. Were defendant the stereotyped shrew portrayed by plaintiff's testimony, the likelihood is that he would have removed himself from the picture long ago. Taken as a whole, plaintiff's tale of woe lacks the ring of truth.

No lengthy review of defendant's testimony is necessary, as her version of events is generally more spontaneous, straightforward, and believable. The episode on the basis of which the master rejected her testimony (her professed surprise on being told at the hearing that she would not receive alimony if the divorce were grant-

ed) reflects more on her motives for contesting the divorce, and the truthfulness of her statement that she still loves her husband, than on the accuracy of her recital of past events.

The inference of "settled hate and estrangement" that we would have to draw from the credible evidence in order to rule in plaintiff's favor cannot be drawn without resort to speculation. But cf. *Silfies v. Silfies,* 168 Pa. Super. 421, 79 A.2d 130 (1951). The rule that controls this case was stated in *Bobst v. Bobst,* 160 Pa.Super. 340, 343, 51 A.2d 414, 416 (1947):

> "No rule has securer footing than that 'the testimony of the husband, denied and contradicted by the wife, (as in this case,) cannot be regarded as creating more than a doubtful balance of evidence. When such a situation occurs, the libellant fails to make out a clear and satisfactory case.' "

The instant plaintiff has similarly failed to meet his burden of proof, and the lower court's dismissal of the complaint was proper.

Order affirmed.

HOFFMAN and SPAETH, JJ., file dissenting opinions.

HOFFMAN, Judge, dissenting:

Appellant, plaintiff-husband in a divorce action in the court below, contends that the lower court erred when it dismissed appellant's complaint despite the master's recommendation that a divorce be granted.

Appellant filed a complaint in divorce a. v. m. on June 9, 1972, based on a claim of indignities.[1] A master,[2] appointed on October 4, 1972, took testimony on February

---

1. Act of May 2, 1929, P.L. 1237, § 1 et seq.; 23 P.S. § 10(f).

2. The master was Leonard Sugerman, Esquire, now Judge Sugerman, elevated to the bench during the course of the proceedings, but who upon agreement of the parties continued as the master.

6, February 22, and September 17, 1973. Although the hearing was extensive, neither party presented corroborative evidence; rather both appellant and appellee chose to rely on his and her own oral testimony. On March 4, 1975, the master filed his report in which he recommended that the court grant the divorce on the ground of indignities. Appellee filed exceptions to the report, first that the master's conclusions concerning credibility were not supported by the record, and, second, that, even crediting appellant's testimony, the record did not support a finding of indignities. On August 29, 1975, the lower court dismissed appellant's complaint, based on appellee's first exception.[3] After a review of the record of the master's hearing, the court found that appellant's testimony was "replete with inherent improbabilities, inconsistencies, and contradictions."

The lower court and both parties agree that the instant case turns on this Court's holding in *Gehris v. Gehris*, 233 Pa.Super. 144, 334 A.2d 753 (1975). The lower court distinguished the facts of the instant case from those in *Gehris*.[4] I believe that this case is con-

[3]. As to the second contention that appellant made out a case of indignities, the lower court stated that "[i]f the record . . . would support the Master's determination that the plaintiff was completely credible there's no question that the record would support a divorce on the grounds of indignities." As will appear obvious from a recitation of the master's findings, infra, the lower court was correct in so holding.

[4]. The lower court attempted to distinguish *Gehris* as follows: "While *Gehris,* supra, is nearly on point, the same result in the case at bar must not necessarily follow. In *Gehris,* the finding of the lower court was affirmed because, inter alia, ' . . . the husband's contentions concerning the wife's constant complaints about living conditions and the husband's lack of earning capacity were uncontested.' However, in the case at bar, all of the husband's contentions have been contested and the Master has not merely chosen to believe the husband's version of the story as the decision would seem to indicate was done in *Gehris,* but rather the Master has chosen to rely on a few specific items of testimony which he claims illustrates that demeanor which would or would not support the credibility of the parties and which brings us to the crux of the problem." As will become apparent from my discussion, infra, I believe that *Gehris* is indistinguishable from the instant case.

trolled by our decision in *Gehris* and that we must, therefore, reverse.

The Majority is correct in stating that "[i]t is well-settled that in divorce cases, the evidence must be considered de novo at every stage of review; and that review extends to questions of credibility. . . ." (At 1297). See also, *Eifert v. Eifert*, 219 Pa.Super. 373, 281 A.2d 657 (1971); *Del Vecchio v. Del Vecchio*, 169 Pa.Super. 617, 84 A.2d 261 (1951). However, we noted in *Gehris* that "[t]he obvious important exception to de novo review by a reviewing court is that great weight must be accorded to the findings of the court or master below *if the issues of credibility are ones that are necessarily resolved by personal observations*. For example, if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court." 233 Pa.Super. at 148, 334 A.2d at 755. (Emphasis added). See also, *Uhlinger v. Uhlinger*, 169 Pa.Super. 574, 83 A.2d 423 (1951). In an effort to review such findings, an appellate court is remitted to speculation; therefore, traditionally, credibility has been entrusted to the factfinder who hears and observes the witnesses.

In *Gehris*, the appellant urged this Court to reverse findings of the lower court which had seen and heard the witnesses. In *Dougherty v. Dougherty*, 235 Pa.Super. 122, 127, 339 A.2d 81, 84 (1975), the appellant challenged the master's findings as " 'one sided, prejudicial, and not based upon the evidence presented.' " The lower court had adopted the master's recommendations that a divorce be granted. Procedurally, the instant case is different from *Gehris* and *Dougherty* only in that the lower court herein exercised de novo review, rejected the master's findings and denied the divorce. The lower court was in the same position as an appellate court—it did

not have an opportunity to observe the witnesses and should, therefore, have "accorded [great weight] to the findings of the . . . master below" because "the issues of credibility . . . [were] necessarily resolved by personal observations." *Dougherty v. Dougherty,* supra, at 127, 339 A.2d at 84. Thus, although different on its facts, the instant case is legally indistinguishable from *Dougherty* and *Gehris.*

In the instant case, the master heard ample testimony; appellee directly contradicted appellant's testimony. The master found that appellant was more credible than appellee: "Plaintiff was content to merely contradict many of his allegations in her case in chief. The plaintiff's testimony was in the main forthright and unembellished, relatively specific, and delivered without hesitation or equivocation. It recounted some twenty years of marriage. When occasionally pressed by his counsel to remember details of incidents occurring ten or fifteen years earlier, on those occasions when he was unable to so recall, he frankly said so. When given an opportunity to embellish his recollection, he refrained from doing so. He answered the questions put to him without hesitation or equivocation. The Master having seen and heard plaintiff testify, is convinced that his testimony was credible and is of the weight and quality necessary to support a decree provided the acts of which the plaintiff complains are sufficient to constitute indignities to the person.

"Applying the same principles to the testimony of the defendant, however, does not lead the Master to a similar conclusion. Most of her denials and 'contradictions' were general in nature. Phrases as, 'it isn't true' or 'that never happened' are spread throughout the record without further explanation or detail. In her responses upon cross-examination, the defendant was at times evasive and self-contradictory."

Further, despite appellee's denial of some of appellant's allegations, the master found as follows:

"(a) Throughout the course of the marriage, the Plaintiff worked at two occupations at the same time, in order to increase his level of income; notwithstanding the Plaintiff's industry, the Defendant commencing shortly after the marriage ceremony and continuing throughout the course of cohabitation, both privately and in the presence of the parties' friends, berated and belittled the Plaintiff concerning his income, compared him unfavorably with others with respect to his earning ability, and referred to the Plaintiff as a failure . . . ; such remarks were generally prefaced by the phrase, 'you son of a bitch of a bastard, get out and make money'. . . .

"(b) In addition to such complaints, the Defendant on a daily basis throughout the course of cohabitation called the Plaintiff a 'no good son of a bitch of a bastard' and told him that he 'never did anything right'. . . .

"(c) Commencing in 1955 and continuing until the summer of 1971, occasionally on a daily basis, the Defendant told the Plaintiff that his mother was a 'no good troublesome bitch'. . . . a 'troublesome, meddlesome bitch' . . ., or did otherwise demean and degrade the Plaintiff's mother . . .; such phrases were used by the Defendant in the presence of the Plaintiff and his mother, and on one occasion, in the presence of a stranger and the parties' neighbors . . .; the Defendant also told the Plaintiff, in the presence of the parties' children, commencing in 1964 and continuing throughout the course of cohabitation, that his mother was a 'noisy, meddlesome bitch' and a 'troublemaker'. . . .

"(d) Commencing in 1964 and continuing until the parties' separation in June, 1972, the Plaintiff was required to constantly plead with and cajole the Defendant to prepare coffee for the Plaintiff; notwithstanding such

pleas, the Defendant generally refused to prepare coffee, telling the Plaintiff two or three times each week to 'get your own damned coffee'. . . .

"(e) Commencing in 1960, and for a period of ten years thereafter, the Defendant frequently refused to prepare lunch for the Plaintiff in spite of his request, telling the Plaintiff that she would prepare lunch 'when she was good and ready', notwithstanding the Plaintiff's schedule . . . ; by reason of the Defendant's failure to prepare lunch for the Plaintiff, he was required to take lunch in restaurants. . . .

"(f) Commencing in 1953 and continuing until the parties' separation in June, 1972, although the Plaintiff was able to return to the marital home twice each week for dinner, the Defendant generally refused to prepare meals more than once each month, preferring instead to serve the Plaintiff a 'TV dinner' or food remaining from prior meals, immediately returning to the television set . . . ; when the Plaintiff complained to his wife about the food, she said, 'get home at a more reasonable hour. Why can't you be like other men that punch a clock from eight to four and be here when dinner is served'? . . .

"(g) Commencing in 1953 and continuing until 1970 or 1971, six nights each week, although the Plaintiff retired at eleven o'clock p.m., the Defendant failed to join him in the marital bedroom, preferring instead to watch television until the early hours' of the morning; as a result of such conduct, the parties' sexual contact was limited to the point where the Plaintiff felt something might be wrong with himself . . . ; for a period of three months in 1967, the Defendant completely refused to engage in sexual intercourse with the Plaintiff . . . ; and the Defendant's conduct caused the Plaintiff to feel 'terrible'. . . .

"(h) Commencing in 1957 and continuing until 1971, the Defendant, five days each week, failed to launder the

242

Plaintiff's clothing, and as a result the Plaintiff had no clean socks or pressed shirts . . . ; when the Plaintiff complained, the Defendant always responded, 'you son of a bitch, do them yourself' . . .; on occasion, by reason of the Defendant's omissions, the Plaintiff was required to personally launder his clothes. . . .

"(i) Commencing in 1963, the Defendant, three or four times, each week, told the Plaintiff she no longer loved him, and could not understand why she had married him . . . ; once or twice weekly, during the same period, the Defendant told the Plaintiff she hated him and hated the ground he walked on . . . , and that she didn't care if the Plaintiff ever returned from work and in fact hoped he did not. . . .

"(j) Although the parties and their children took yearly vacations for a period of eight years, and in addition, the children attended various camps, the Defendant, commencing in 1963 and continuing until the separation in June, 1972, continually referred to the Plaintiff as an inadequate husband and father and falsely accused him of failing to take the Defendant and the children on such vacations. . . .

"(k) Commencing in 1959 or 1960, and continuing throughout the course of cohabitation, when the parties disagreed upon financial matters or methods of disciplining the parties' children, the Defendant generally became enraged, and at least once each month threw pots, pans, dishes, chairs and other articles at the Plaintiff . . . ; on one occasion, the Defendant struck the Plaintiff in the eye, causing it to bleed . . . ; and during such rages, the Defendant frequently threw edible food away and on occasion broke or destroyed other property. . . .

"(l) Commencing in 1962 and continuing once or twice weekly until the parties' separation in June, 1972, the Defendant told the Plaintiff that his business associates and other persons visiting the Plaintiff's office or

calling the Plaintiff on the telephone located in the parties' home were 'bums', 'tramps', and 'scum'. . . .

"(m) Commencing in 1966, and continuing on an almost daily basis until the parties' separation in June, 1972, the Defendant, without provocation, humiliated the Plaintiff by referring to him as a son of a bitch, a bastard, a son of a bitch of a bastard, and a bum . . . ; such language was frequently used by the Defendant in the presence of the parties' children . . . on one occasion, the Defendant called the Plaintiff a 'fucking bastard' in the presence of the parties' eight year old daughter . . . ; usually, when the Plaintiff asked his wife to refrain from using such language, she advised him that [she] would use any damn word she wanted". . . .

"(n) About twice each week, from 1958 until 1970, the Plaintiff who worked 65 to 70 hours weekly, was able to return to the marital home on two afternoons each week in order to take a nap; although aware that he was endeavoring to sleep, the Defendant created or permitted noise in many forms to disturb such sleep, as operating the vacuum cleaner and permitting the children to play next to the bedroom; although the Plaintiff continually complained to the Defendant, she failed to take any steps to alleviate the condition. . . .

"(o) During arguments occurring in the middle of the night three or four times weekly during the last two years of cohabitation, the Defendant's loud and raucous voice caused the parties' daughter who occupied the adjoining bedroom, to awaken and pound on the wall . . . ; when the Plaintiff asked the Defendant to stop such conduct she became even louder. . . .

"(p) Commencing in 1967 and continuing once or twice weekly until the parties' separation in June, 1972, the Defendant consumed alcoholic beverages until she became inebriated . . . ; when she drank, the Defendant became more raucous and loud, arguing with the

Plaintiff on occasion the entire night . . . , and cursing and swearing at the Plaintiff; frequently the Plaintiff found sherry bottles or unconsumed glasses of sherry hidden in the refrigerator and behind chairs . . . ; when the [plaintiff] finally removed all alcoholic beverages from the house in order to curtail the Defendant's drinking, she began to use money provided by the Plaintiff for groceries to purchase intoxicants. . . . .

"(q) Commencing in the spring of 1968, nearly every day, the Defendant falsely accused the Plaintiff of engaging in illicit relationships with other women . . . ; on one occasion, in 1972, the Defendant awakened the Plaintiff from his sleep and said, 'Get out of there, you bastard. Go out with your girl friend'. . . .

"(r) In 1969 while in Bermuda with the Plaintiff and many of his business associates, the Defendant became inebriated, refused to leave the bar, could barely stand and refused to board the bus, thereby embarrassing and humiliating the Plaintiff by such conduct. . . .

"(s) On June 1, 1972, the Defendant, while inebriated, called the Plaintiff a no-good impotent bastard, telling him to take his 'things' and leave the marital home with his girl friend. . . .

"(t) In August, 1970, in the mountains of Pennsylvania, the Defendant again became inebriated, whereupon the Plaintiff went to a nearby hotel joining friends at a table; the Plaintiff danced once with one of the women at the table whereupon the Defendant approached the table and instigated a loud argument with the Plaintiff; as a result of the Defendant's behavior, the Plaintiff to his humiliation and embarrassment was ordered from the premises. . . .

"(u) On May 25, 1972, the Plaintiff endeavored to take his daughter to a magistrates' dinner; an argument ensued between the Plaintiff and the Defendant, where-

upon the Defendant, in the presence of the parties' daughter, called the Plaintiff a 'no-good son of a bitch of a bastard' and told him she would never again permit the Plaintiff to take his daughter anywhere. . . .

"(v) Throughout the course of the marriage, the Plaintiff provided his family with a proper home, sufficient income, conducted himself as a proper husband and father, and gave the Defendant no cause or justification for the behavior she exhibited toward him; as a result of such conduct on the part of the Defendant, the Plaintiff became and remained nervous and upset and was frequently unable to swallow food, consulted with several physicians and was directed to take various tranquilizers to ease his tensions . . . ; as a further result of his wife's conduct, the Plaintiff's business suffered, causing his company to speak with him and express concern about his reduced production of business. . . ."

1 find no inherent improbability, internal inconsistency, or contradictions sufficient to substitute our judgment, or for the lower court to have substituted its judgment, for that of the master.[5] Thus, we are faced with the identical problem resolved in *Gehris:* "Faced merely with the record in which the wife asserts that her refus-

---

5. Although citing *Gehris* with apparent approval, the Majority ignores the explicit mandate of that case. It engages in precisely the kind of selective reading of the record which was rejected in *Gehris* and which requires substitution of our judgment for that of the original factfinder on matters outside the scope of our expertise. For example, the lower court and the Majority "accepted the wife's version of the coffee problem" because "[h]er denial that she ever refused to make him lunch or dinner is *at least as credible* as his testimony to the contrary." (At 298; emphasis added). If the Majority's test were applied, a party would be hard-pressed ever *to* win a lawsuit. In the vast majority of cases, an appellate court, if free to search the record at will, could find opposing statements, neither of which was inherently incredible. In all of those cases, according to the Majority, the moving party could not win. That, however, is why appellate courts must entrust factfinding to the master or the lower court, because, although we cannot determine from the record who is believable, the factfinder can use common sense and observation to sort out the truth.

al was not intended to embarrass the husband and the husband states that her actions were so intended, this Court has little basis to decide the question. The Court, however, is not merely faced with two contradictory statements. The Court has the benefit of the opinion of the judge who heard the testimony that indicates that he believed the husband's statement." 233 Pa.Super. at 149, 334 A.2d at 755.

Therefore, I would reverse and reinstate appellant's complaint in divorce.

SPAETH, Judge, dissenting:

This appeal presents the issue of the scope of our review in a divorce case.

Judge CERCONE, citing *Gehris v. Gehris,* 233 Pa.Super. 144, 334 A.2d 753 (1975), states that "[i]t is well-settled that in divorce cases, the evidence must be considered de novo at every stage of review; and that review extends to questions of credibility." Majority opinion at 1297. He then demonstrates by his discussion of the evidence that by this statement of the law he means that our scope of review is entirely uninhibited; thus he pays no attention to the master's report. Judge HOFFMAN, on the other hand, also citing (and quoting) *Gehris,* states that where the master is the only one who has heard the witnesses, his decision on credibility is "necessarily dispositive" and "cannot effectively be reviewed," either by the lower court in the first instance, or on appeal by this court. Dissenting opinion at 1301.

I cannot accept either of these statements of the law. Taking the law as I find it, I nevertheless agree with Judge HOFFMAN (and disagree with Judge CERCONE) in concluding that a divorce should be granted.

I

The issue of the scope of our review in a divorce case may arise in any of three contexts: where the testimony

has been heard by a jury; where it has been heard by a judge sitting without a jury; and where it has been heard by a master.

–A–

Where the testimony has been heard by a jury,

it is the duty of the court to examine the testimony only to ascertain if there is evidence to support the verdict. Whether the court would have reached the same conclusion if it had been the trier of fact is irrelevant [footnote omitted]. A. Freedman & M. Freedman, *Law of Marriage and Divorce in Pennsylvania,* vol. 2, § 617, p. 1226 (collecting cases).

–B–

It might seem that the findings of a judge sitting without a jury should be accorded the same weight as a jury's verdict, and indeed there is a suggestion to this effect in the early cases. *See* in particular *King v. King,* 36 Pa.Super. 33, 35 (1908). However, the law is long-settled that this is not so. The leading case is *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350 (1933). There the judge concluded that a divorce should be granted. This court reversed, stating that "the proofs submitted by the libellant do not come up to the required standard." 105 Pa.Super. 261 at 264, 161 A. 425 at 426. On appeal to the Supreme Court, the libellant challenged the power of this court to examine the evidence de novo. The Supreme Court, however, rejected the challenge, quoting with approval this court's decision in *Fay v. Fay,* 27 Pa. Super. 328, 334–5 (1905), which had in turn quoted *McClurg's Appeal,* 66 Pa. 366 (1870), where it was said, at 374–75, that the "only exception" to the rule that the testimony will on appeal be examined de novo "is where a fact has been found by a jury trial."

It does not follow from this insistence upon de novo review that no weight is to be given the judge's findings.

Thus in *Uhlinger v. Uhlinger,* 169 Pa.Super. 574, 576–77, 83 A.2d 423, 424 (1951), this court stated:

As to the various incidents said to constitute indignities to the person, the record discloses irreconcilable conflicts in the testimony at every turn of the page. Judge Kennedy concluded that the credible testimony was adduced by the plaintiff and his witnesses, and this judgment in this particular is entitled to the highest consideration in an appellate court. *Bobst v. Bobst,* 357 Pa. 441, 54 A.2d 898; *Handy v. Handy,* 163 Pa.Super. 49, 60 A.2d 415. We recognize, of course, *that it is our duty to examine carefully* the testimony and base our conclusion on our own independent judgment; yet at the same time we realize that the judge who saw the witnesses, observed their manner, and heard them testify, had a better opportunity to determine their credibility than we, who must rely upon what appears in "cold type". *Tanner v. Tanner,* 159 Pa.Super. 637, 49 A.2d 875.

And in *Spence v. Spence,* 167 Pa.Super. 248, 250–51, 74 A.2d 495, 496–7 (1950), this court stated:

In this conflict of testimony the lower court accepted the testimony of the libellant, corroborated in some, but not in all respects, by that of his brother. Where in a divorce proceeding, as here, credibility is the issue, the conclusion of the hearing judge, as to which of the parties is to be believed, is entitled to respect. *Ussler v. Ussler,* 158 Pa.Super. 215, 44 A.2d 526; *Weber v. Weber,* 156 Pa.Super. 6, 39 A.2d 144. In referring to the principle Mr. Justice Linn, in *Wick v. Wick,* 352 Pa. 25, 42 A.2d 76, said: "Presumably, a trial judge's opportunity to observe the parties and witnesses during the trial, became the basis of a rule that 'when witnesses who are competent and equally interested, flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed.' *Krug v. Krug,* 22 Pa.Super. 572,

573; *Koontz v. Koontz,* 97 Pa.Super. 70; *Dearth v. Dearth,* 141 Pa.Super. 344, 15 A.2d 37. In accord with that rule, we have at times resolved doubt in dealing with conflicting testimony, by relying on expressed or implied conclusions of the trial judge."

*Accord: Partleton v. Partleton,* 169 Pa.Super. 485, 82 A. 2d 684 (1951).

In *Gehris v. Gehris, supra,* Judge HOFFMAN cites *Uhlinger, Spence,* and *Partleton,* for the proposition that

if the ultimate decision rests on a statement asserted by one party and denied by the other, where there is no corroborative evidence, demeanor on the stand is necessarily dispositive of the issue and is the kind of evidence that cannot effectively be reviewed by an appellate court.

233 Pa.Super. at 148, 334 A.2d at 755.

Although I join *Gehris* (Judge Van der Voort, joined by Judge Price, dissented), I now acknowledge that it goes beyond the law; neither the cases cited (as the above quotations from them show), nor any other cases I have found, warrant the expressions "necessarily dispositive" and "cannot effectively be reviewed." A more accurate statement of the law is that quoted by this court in *Spence v. Spence, supra:*

"When witnesses who are competent and equally interested, flatly contradict each other, the conclusion of the judge who heard them, as to which is to be believed, is not to be lightly disturbed."

Having said so much, I wish to note my disagreement with the law. To me, the formulation "not to be lightly disturbed" is so ambiguous as to be useless. Plainly, it substantially undercuts "de novo review." Equally plainly, no one can tell how substantially. Worse than being useless, however, the formulation opens the way for this court to grant or deny a divorce arbitrarily, that is to say, without any standard that can be articulated so that the parties to the action will understand why they

have won or lost. If the lower court's order is disturbed, who can say whether it has been "lightly" done? And with such a standard, who can predict how an appeal will be decided?

The problem raised by these questions is similar to that formerly encountered by the courts in attempting to define what error was "fundamental." That attempt has been abandoned. *Dilliplaine v. Lehigh Valley Trust Co.,* 223 Pa.Super. 245, 297 A.2d 826, *aff'd,* 457 Pa. 255, 322 A.2d 114 (1972); *Commonwealth v. Clair,* 458 Pa. 418, 326 A.2d 272 (1974). So should the courts abandon the attempt to insist upon a review that while "de novo", does not "lightly disturb" the lower court's findings.

When a case has been tried before a judge sitting without a jury, there should be no distinction so far as appellate review is concerned between a divorce case and any other kind of case. The general rule is:

On appeal, after findings made by a judge without a jury, the function of the appellate court is to determine whether the findings of fact and conclusions of law of the trial judge, approved by the court en banc, are sufficiently supported by the evidence. In so far as the finding of the court is not supported by the evidence, it will not be permitted to stand. The case will be disposed of as if the facts had been found by a jury. The evidence and proper inferences therefrom favorable to the finding must be taken as true and all unfavorable to it must be rejected.

6 Standard Pa. Practice 30 (footnotes, citing cases, omitted).

We apply this rule in deciding whether the trial judge's findings that a woman was, or was not, raped should be upheld; I see no reason why we should not apply it in deciding whether his finding that a woman did, or did not, commit indignities should be upheld.

This opinion of mine, however, is not the law; I express it only in the hope that it may someday become

the law. In the meantime, *Esenwein v. Esenwein, supra*, holds that on appeal a divorce case, unless it was heard by a jury, is to be reviewed differently from any other kind of case. Until *Esenwein* is overruled, we are bound by it; and not only has *Esenwein* not been overruled, it has relatively recently been cited with approval. *Zimmerman v. Zimmerman*, 428 Pa. 118, 121, 236 A.2d 785, 787 (1968).

–C–

The law on the effect to be given a master's findings, when the master is the only one who has heard the testimony, is likewise settled, albeit, in my view, also unsatisfactorily.

The leading cases are *Middleton v. Middleton*, 187 Pa. 612, 41 A. 291 (1898), and *Nacrelli v. Nacrelli*, 288 Pa. 1, 136 A. 228 (1927). In *Middleton* the lower court approved the master's report, which recommended that a divorce be granted. Reversing, the Supreme Court said:

> Whether the marital contract shall be severed is the gravest of questions, not alone to the parties, but to the state, for the social structure rests upon it. It never was intended that judicial function should in any material degree be relinquished by conducting the proceedings before a master in his office, or that weighty judicial responsibility should be evaded by shifting it over to a member of the bar. We feel sure, a careful perusal of the statutes, will convince any one of the correctness of these observations. The ability, learning and conscience of the court must be called into exercise before there can be a dissolution of this contract. While the witnesses may be examined, and their testimony reduced to writing by the examiner, the court must, before decree, be satisfied by its own knowledge of the testimony that the averments of the libel have been proved by full and competent evidence. It is not sufficient that they have been proved to the

satisfaction of the examiner by witnesses that the court neither saw nor heard.

187 Pa. at 615, 41 A. at 291.

Likewise, in *Nacrelli* the lower court approved the master's report, which recommended that a divorce be granted. On appeal to the Supreme Court it was argued that *Middleton* was distinguishable. At the time *Middleton* was decided, there was no statutory authority for the master to do anything except take and return the testimony; at the time *Nacrelli* was argued, the master was authorized to take the testimony and to return it, "together with a report of the proceedings before him and his opinion of the case, to the court." Act of March 10, 1899, P.L. 8, replaced by subsequent acts. The Supreme Court rejected the suggestion that these statutory changes added weight to the master's findings. Said the Court:

> These statutes do not change or attempt to change the duty of an appellate court to examine the testimony in divorce cases. President Judge ORLADY, speaking for the court in *Breene v. Breene*, 76 Pa.Super. 568, 570, says: "We are obliged by the statute of May 5, 1899, P.L. 250, section 7, conferring our jurisdiction [as theretofore exercised by the Supreme Court], to examine for ourselves the testimony in cases of this character, and to determine therefrom, independent of the findings of an examiner, or even in the court below, whether in truth and in fact a legal cause of divorce has been made out. Ever since the passage of this act, it has been held incumbent upon this court, on an appeal from a decree of divorce, except where there has been an issue and jury impanelled, to review the testimony and adjudge whether it sustains the complaint of the libellant." Prior to 1899 the trial court appointed examiners, sometimes called masters, to take testimony in divorce cases, and return the same to the court, but the statutory right to make a report and ex-

press an opinion of the case seems to have originated in that statute. Such opinion is merely advisory and in no sense relieves the trial court of its duty to fully examine the testimony and decide upon the merits of the case. Sturgeon's Pennsylvania Law and Procedure in Divorce (2d ed.) page 391. Such decision in each divorce case should be founded on the court's personal examination of the testimony and in every contested case should be accompanied by a discussion of the evidence and a finding of the necessary facts and legal conclusions.

288 Pa. at 5–6, 136 A. at 229.

This characterization of the master's findings as "merely advisory" has not always been followed. Where the case turns on credibility, it has been said that the master's findings are "entitled to the fullest consideration." *See, e. g., Smith v. Smith,* 157 Pa.Super. 582, 583–85, 43 A.2d 371, 372 (1945) (extended discussion). Sometimes the two standards are combined. For example, in *Vautier v. Vautier,* 138 Pa.Super. 366, 367, 11 A. 2d 207, 208 (1939), this court said:

> We have repeatedly held that the report of the master is advisory only, and that it is our duty to examine the testimony carefully and make our independent finding. A report of a master, who has had the advantage of seeing and hearing the parties and their witnesses, is, nevertheless, to be given fullest consideration: *Lyons v. Lyons,* 116 Pa.Super. 385, 176 A. 792.

*And see Freedman, supra,* vol. 2, § 654 n. 20–22 (collecting cases).

These principles, despite their frequent reiteration, are attended in their application with great difficulty, which may be traced to the fact that *Middleton v. Middleton, supra,* and the many cases deriving from it, are built on a logical fallacy. In *Middleton,* as has been noted, it was said that "[i]t is not sufficient that [the allegations of desertion] have been proven to the satisfaction of the *ex-*

*aminer* by witnesses that the court neither saw nor heard." (Emphasis added.) 187 Pa. at 615, 41 A. at 291. This may be granted. However, neither can it be sufficient for the allegations to have been proved to the satisfaction of the *court* by witnesses it neither saw nor heard. It is absurd to suppose that a judge can by himself, *i. e.*, "de novo," make a sound decision in a case that turns on credibility, when the judge has not heard the witnesses.

Nor is the absurdity lessened by the reference in *Middleton* to the State's interest in the marital contract. The State's interest is not to preserve the marital contract willy nilly; it is to preserve the contract if there is no legal cause to sever it. This interest cannot be served by the rule announced in *Middleton*. A judge who decides questions of credibility without having heard the witnesses is very likely to make a mistake. Sometimes his mistake will result in preserving a marital contract that should be severed; other times it will result in severing a marital contract that should be preserved.

As I understand Judge HOFFMAN's opinion, he would escape the absurdity of *Middleton* by holding that a master's findings on credibility are "necessarily dispositive" and "cannot effectively be reviewed." However, I simply find no authority for this proposition. I recognize that he relies upon his opinion in *Gehris v. Gehris, supra,* but as I have stated above, in my view *Gehris* itself goes beyond the decided law.

Any doubt in this regard is removed by this court's decision in *Langeland v. Langeland,* 108 Pa.Super. 375, 164 A. 816 (1933). There the lower court held just what Judge HOFFMAN says we should hold here. In its opinion the lower court said:

Being unwilling to reverse the findings of the master, who met the witnesses, observed them while giving testimony and gave careful consideration to all the testimony as his report shows, when the determination

depends upon the credibility of the witnesses, we feel it our duty to confirm his report.

*Id.* at 378, 164 A. at 817.

This court unanimously reversed, saying: "This language, we think, indicates a misapprehension upon the part of the court below of its duty in divorce cases, as defined in *Nacrelli v. Nacrelli, supra.*" *Id.* To be sure, we might overrule *Langeland,* except that it is based upon *Nacrelli,* by which we are bound. Moreover, it has relatively recently been cited with approval. *Zimmerman v. Zimmerman, supra,* 428 Pa. at 121, 236 A.2d at 787.

In these circumstances, the only escape that I see from the absurdity of *Middleton* is to concentrate upon the injunction in the later cases, that where the issue is credibility, the master's findings are "entitled to the fullest consideration." See, *e. g., Smith v. Smith, supra.* I do not suggest that this is an easy solution. One cannot accomplish a "de novo" review while at the same time giving the master's findings "the fullest consideration." Our law would be healthier if the insistence upon a "de novo" review were abandoned. Also, in a given case there may be different opinions as to what "fullest consideration" means. For example: In *Rankin v. Rankin,* 181 Pa.Super. 414, 124 A.2d 639 (1956), this court was unanimous in setting aside a master's findings; but in *Faszczewski v. Faszczewski,* 182 Pa.Super. 295, 126 A.2d 773 (1956), and *Shank v. Shank,* 130 Pa.Super. 122, 196 A. 570 (1938), the court divided, five to two in *Faszczewski,* and four to three in *Shank,* the dissenting judges arguing in both cases that the majority had in fact not given the fullest consideration to the master's findings. However, difficult cases will always engender differences of opinion. If we do not take "de novo" too literally, and if we make an earnest effort to give the master's findings on credibility "the fullest consideration," I think that at least in most cases we shall not

miss the mark by much. If in a given case we conclude to reject the master's findings, we should explain in detail the basis of our rejection. Thereby we shall avoid, at least as much as possible, the danger of making an arbitrary decision.

## II

It remains to apply the law, as I have found it to be, to the facts of the present case.

I cannot join Judge CERCONE's opinion because it seems to me he has failed to follow the injunction that where the issue is credibility, the master's findings are "entitled to the fullest consideration." He gives the findings no consideration at all: they are hardly mentioned, much less analyzed. This is in striking contrast to the treatment of the master's findings in *Shank v. Shank, supra.* There the majority opinion rejected the master's findings, but explained in detail the basis of its rejection. Judge HOFFMAN's opinion demonstrates, at least to me, that when the master's findings are given consideration, they prove persuasive. They are full and internally consistent, and they record facts by no means improbable. Accordingly, to accept the findings is not in my judgment inconsistent with our responsibility to make a de novo review.

There is a second difficulty I have with Judge CERCONE's opinion. In reviewing the record, he has in my judgment applied an incorrect legal standard. Thus he states that to rule in favor of appellant, "we would have to draw from the credible evidence" "[t]he inference of 'settled hate and estrangement.'" Majority opinion at 1299. I submit that this is not so. In a concurring opinion in *Steinke v. Steinke*, 238 Pa.Super. 74, 86, 357 A.2d 674, 680 (1975), I pointed out that it is not necessary to prove settled hate and estrangement:

[T]he "essential feature of a charge of indignities", *Phipps v. Phipps* [368 Pa. 291, 81 A.2d 523 (1951)], is

a "course of conduct" that will depend "largely upon the circumstances of each case" but that in every case must be "inconsistent with the position and relation as a spouse," *McKrell v. McKrell* [352 Pa. 173, 42 A.2d 609 (1945)], and render the condition of the injured and innocent spouse "intolerable" and his or her life "burdensome", Act of May 2, 1929 [P.L. 1237, § 10, as amended by the Act of Mar. 19, 1943, P.L. 21, § 1], 23 P.S. § 10.

This test, as the master's findings amply show, has been met.

The order of the lower court should be reversed and the record remanded with instructions to enter an order divorcing appellant from appellee.